1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                      CENTRAL DISTRICT OF CALIFORNIA

10

11   FRED G.,                              Case No. 2:22-cv-05710-FLA (Ex)

12                       Plaintiff,         **MEMORANDUM OF DECISION**

13         v.                              **FOLLOWING BENCH TRIAL**

14
     ANTHEM BLUE CROSS LIFE AND
15   HEALTH INSURANCE CO., *et al.*,

16                       Defendants.

17

18

19

20

21

22

23

24

25

26

27

28

This action arises from the denial of a request for benefits under a tax-exempt, multi-employer health plan (the "Plan"), governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"). Plaintiff Fred G. ("Plaintiff") brings claims against Defendant Director's Guild of America-Producer Health Plan ("Defendant" or "DGA")[1] for: (1) recovery of benefits due under an ERISA benefit plan, pursuant to 29 U.S.C. § 1132(a)(1)(B) ("§ 1132(a)(1)(B)");[2] and (2) breach of fiduciary duty under § 1132(a)(3). Dkt. 13.

This matter came to bench trial on December 6, 2024.[3] Dkt. 101. After evaluating the evidence and considering the parties' arguments, the court issues the following findings of fact and conclusions of law,[4] pursuant to Fed. R. Civ. P. 52(a).

## FINDINGS OF FACT

### I.    The Plan

The Plan provides medical benefits for its participants and their covered dependents. DGA_FG 001400.[5] The Plan documents consist of the DGA-Producer Pension and Health Plans Health Trust Agreement ("Trust Agreement," *id.* at 001239–94) and Summary Plan Description ("SPD," *id.* at 001295–431). Plaintiff is a Plan

---

[1] Plaintiff originally brought this action against DGA and former Defendant Anthem Blue Cross Life and Health Insurance Company ("Anthem"). Dkt. 1. On September 17, 2024, Anthem was dismissed from the action with prejudice pursuant to the parties' Notice of Settlement. Dkt. 88.

[2] 29 U.S.C. § 1132 is also commonly referred to as ERISA § 502.

[3] In the Ninth Circuit, actions to recover benefits under ERISA are adjudicated by bench trial. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999).

[4] The court's characterization of its determinations as a "finding of fact" or "conclusion of law" is not controlling. To the extent a determination is characterized as "conclusion of law" but is more properly characterized as a "finding of fact," or vice versa, substance shall prevail over form.

[5] Citations to "DGA_FG" refer to the Plan's administrative record, which was lodged as Dkts. 46-1 and 65-1. Citations to "ANTHEM_FREDG" refer to Anthem's administrative record, which was lodged as Dkts. 47-1 through 47-12.

participant, and his son, J.G., is a beneficiary.  *Id.* at 000001.

The Plan covers mental health and substance abuse services, including intensive outpatient and residential treatments for substance abuse or mental health.  *Id.* at 001360.  All care (aside from covered preventive care services which are not at issue here) must be "Medically Necessary," as the term is defined in the Plan documents. *Id.* at 001355.  As relevant here:

> A treatment, service or supply is Medically Necessary when it is:
>
> - Consistent with generally accepted medical practice within the medical community for the diagnosis or direct care of symptoms, Sickness or injury of the patient, … where and at the time the treatment, service or supply is rendered (the determination of "generally accepted medical practice" is the prerogative of the Health Plan through consultation with appropriate authoritative medical … practitioners);
> - Ordered by the attending licensed Physician…, and not solely for [the participant or beneficiary's] convenience, [his or her] Physician, Hospital or other health care provider;
> - Consistent with professionally recognized standards of care in the medical community with respect to the quality, frequency and duration; and
> - The most appropriate and Cost-Efficient treatment, service or supply that can be safely provided, at the most Cost-Efficient and medically appropriate site and level of service.

*Id.* at 001415–16 (errors in original).  Additionally, "[a] medical or dental service or supply will be considered Cost-Efficient if it is no more costly than any alternative appropriate service or supply when considered in relation to all health care expenses incurred in connection with the service or supply."  *Id.* at 001412.

The Trust Agreement provides, in relevant part:

> The Plan Trustees [the "Trustees"] shall have the sole complete and discretionary authority [to] … (2) grant or deny, in whole or in part, particular claims for benefits filed by participants or beneficiaries, in accordance with the Plan Trustees' interpretation of the Health Plan and their fact findings relative to any such claims for benefits, (3)

grant or deny coverage to persons claiming to be participants or beneficiaries, in accordance with the Plan Trustees' interpretation of the Health Plan and their fact findings relative to any such claim for coverage, … (5) determine the type and duration of any benefits payable to any participant or beneficiary, in accordance with the Plan Trustees' interpretation of the Health Plan and their fact findings relative to any dispute over the type or duration of benefits payable, (6) make any and all other findings of fact, construction, interpretations and decisions relative to the Health Plan, and relative to other rights, if any, of all persons, participants or beneficiaries to benefits or coverage, and (7) construe and/or interpret any provisions of the Health Plan.  No Producer or group of Producers, the Guild, any insurance company or any other person, … or other entity shall have the authority to exercise any of the powers described in this subsection.  …

*Id.* at 001261–62.

The Trustees are jointly responsible for interpreting Plan provisions and establishing rules and regulations governing entitlement of benefits and administration of the Plan, *id.* at 001251–54, but may "allocate in writing fiduciary and non-fiduciary responsibilities or duties among Trustees, including the allocation and delegation of such responsibilities to committees and subcommittees of the Board[.]"  *Id.* at 001263. The Trust Agreement further authorizes the Trustees to "establish such committees as they in their discretion deem proper and desirable for the proper administration of the Health Plan and Health Fund," and establishes the Benefits Committee as a standing committee with the authority and responsibility for, *inter alia*, "[a]pproving benefit awards, and hearing and determining claims appeals[.]"  *Id.* at 001265–66.

"The general purpose of a committee is to study and debate issues that arise in the administration of the Health Plan and the Health Fund and to make recommendations thereon to the Board for action by the Board."  *Id.* at 001265. "Notwithstanding this general limitation, the Board may, by resolution duly adopted, allocate and delegate to a committee the authority to take final action in specified areas; and in such instances the action of the committee shall have the same binding effect as action by the full Board."  *Id.*  At the bench trial, Defendant admitted there is

4

no evidence in the record to establish that the Board delegated to the Benefits

Committee the authority to take final action on approving benefit awards and hearing

and determining claims appeals, by a resolution duly adopted by the Board.

The Trust Agreement also authorizes the Trustees to "designate in writing

persons who are not Trustees to carry out fiduciary or non-fiduciary responsibilities or

duties of the Trustees[.]" *Id.* at 001263. Anthem was the designated claim

administrator for the residential treatment services at issue here. *Id.* at 000001. For

appeal administration, the Plan relies on third-party medical reviewers, such as the

Medical Review Institute of America ("MRI"), to make decisions related to benefits

determinations. *Id.*

## II.    J.G.'s History and Medical Treatment

J.G. was admitted to Outback Therapeutic Expeditions ("Outback"), an outdoor

behavioral health program, from February 17 to May 11, 2020. *Id.* at 000043. In a

Parent Questionnaire, his mother reported that J.G. began using nicotine at age 11 to

12 and used it almost daily prior to his admission to Outback. *Id.* at 000826. He also

began using marijuana at age 15 and used it two to four times per week. *Id.* His

mother further reported J.G. was "often aggressive at home," would "break things,

yell, [and] cuss often," was often angry and defensive, experienced mood swings

often, and was quick to anger without provocation. *Id.* at 000825.[6]

---

[6] J.G.'s behavioral and treatment history are further detailed in the administrative
record. Most notably, Plaintiff reported J.G. began to exhibit aggressive and
hyperactive behavior, anger, frustration, depression, and anxiety after Plaintiff "went
through a very traumatic divorce process" when J.G. was nine years old. DGA_FG
000040. J.G.'s behavior "spiraled downward when he entered middle school in the
fall of 2015," and only grew worse as he transitioned to high school, as he withdrew
further from his family and his oppositional defiance at home escalated. *Id.* at
000041–42. J.G.'s physical and verbal aggression further escalated during the fall and
winter of 2019, to the point that he "destroyed countless items in [their] home,"
"punched and kicked his closet doors until they were folded in half," "destroyed lamps
and mirrors with his fists and by throwing other items at them," "shattered [their] car

On March 25, 2020, J.G. underwent a comprehensive psychological evaluation
conducted by Abby Jenkins, Ph.D. ("Dr. Jenkins"), a licensed clinical psychologist.
*Id.* at 000786–804.  Based on his history and test results, Dr. Jenkins diagnosed J.G.
with: (1) Attention-Deficit/Hyperactivity Disorder, Combined Presentation; (2)
Oppositional Defiant Disorder; (3) Unspecified Anxiety Disorder; (4) Cannabis Use
Disorder; (5) Parent-Child Relational Problem; and (6) Child Affected by Parental
Relationship Distress.  *Id.* at 000801–02, 000804.  Dr. Jenkins "strongly
recommended that following his stay at Outback, [J.G.] go on to a longer-term
residential therapeutic program, such as a therapeutic boarding school or boarding
school with collaborative supports, that can continue addressing each of the above
issues in depth." *Id.* at 000802.  Dr. Jenkins further noted that "[J.G.] remain[ed] at
heightened risk of emotional and behavioral dysregulation outside a structured
treatment setting." *Id.*

On or around May 11, 2020, J.G. was admitted to Catalyst Residential
Treatment Center ("Catalyst"), a residential treatment center and boarding school
located in Utah.[7]  On May 14, 2020, Meghan Kunz ("NP Kunz"), PMHNP

---

visor mirror," and "would thrash and punch the interior of the car when agitated,
making driving with him incredibly dangerous for the whole family."  DGA_FG
000042–43, 000388–94 (photographic evidence).  Plaintiff additionally reported that
"[J.G.] stole a large sum of money from [them] on at least two occasions," "[J.G.]
began leaving home for weeks at a time," "[h]is drug use was also escalating and he
made plans to fake drug tests," "[h]is anxiety, depression, and substance abuse had
gotten so out of control that [their] home environment was no longer safe, and his
ability to regulate his emotions had completely dissipated," and "[his] anger and
aggression had gotten so dire, that there were numerous times [they considered]
calling the police."  *Id.*

[7] The precise date of J.G.'s admission to Catalyst is unclear from the evidence in the
record.  J.G. was discharged from Outback on May 11, 2020.  DGA_FG 000043.  NP
Kunz's psychological medical evaluation states J.G. came to Catalyst directly from
Outback, but lists an admission date of "2/11/2020"—which would have been three
months before he was discharged from Outback.  *Id.* at 000820, 000824.  Other

(Psychiatric Mental Health Nurse Practitioner) conducted a psychiatric medication evaluation of J.G.  *Id.* at 000823.  NP Kunz concurred with Dr. Jenkins' diagnoses and recommended the following pharmacological interventions:

> **MEDICATIONS:** No medications will be started at this time.
>
> **Rationale/ Counseling/ Education Risk vs. Benefit:** I highly recommend this program for the individual, family, group, and recreational therapy.  The academic and Substance use treatment that is offered here at this program will benefit him greatly.  Catalyst will also allow him to work on his emotional regulation, coping skills, cognitive and behavioral issues, and solution focused motives as well as other treatment approaches.

*Id.*  J.G. remained at Catalyst for treatment from the date of his admission until he was discharged on June 4, 2021.  *Id.* at 000949.

## III.    Denial of Benefits and Appeals

In or around May 2020, Anthem received a coverage request for residential psychiatric care at Catalyst for the seven day-period beginning May 15, 2020, which Anthem approved as "medically necessary under [Plaintiff's] benefit plan."  DGA_FG 000009–11.  On May 22, 2020, Anthem approved an extension request for an additional 7 days of residential psychiatric care, beginning May 22, 2020.  *Id.*  On

---

records from Catalyst state J.G. was admitted on "05/11/2019."  *Id.* at 000949. Defendant, in turn, contends J.G. was admitted on May 15, 2020, which was the first date of service Plaintiff requested and Anthem approved.  Dkt. 86 (Def. Opening Trial Br.) at 7; DGA_FG 000001, 000009–18; ANTHEM_FREDG002582.

Based on the evidence submitted, the court finds: (1) J.G. was admitted to Catalyst on or around May 11, 2020; (2) Plaintiff requested approval of residential treatment beginning on or around May 15, 2020; and (3) any conflicting dates reflect typographical errors.  The record indicates J.G. was discharged from Outback on May 11, 2020, and admitted to Catalyst directly.  DGA_FG 000820, 000824.  Furthermore, the dates listed in Catalyst's records, "05/11/2019" and "2/11/2020," differ from May 11, 2020 (5/11/2020) by one year and one key on a keyboard number pad respectively—suggesting typographical errors.  Regardless, the precise date of J.G.'s admission to Catalyst is not material to the court's ultimate findings of fact and conclusions of law.

June 4, 2020, Anthem approved an additional 4 days of residential psychiatric care as "medically necessary under [Plaintiff's] benefit plan," while denying 3 days of requested care as "Not Medically Necessary." *Id.* at 000012–17.

The denial letter states the claim was reviewed by David Naimark, M.D. ("Dr. Naimark"), using the "MCG guideline Residential Behavioral Health Level of Care, Child or Adolescent (ORG: B-902-RES)" (the "MCG Guidelines"). *Id.* at 000016–17; *see also* ANTHEM_FREDG000817–22. The denial letter and Dr. Naimark's notes offered the following rationale for the denial decision:

> The plan clinical criteria considers ongoing residential treatment medically necessary for those who are a danger to themselves or others (as shown by hearing voices telling them to harm themselves or others or persistent thoughts of harm that cannot be managed at a lower level of care). This service can also be medically necessary for those who have a mental health condition that is causing serious problems with functioning. (For example, being impulsive or abusive, very poor self care, not sleeping or eating, avoidance of personal interactions, or unable to perform usual obligations). In addition, the person must be willing to stay and participate, and is expected to either improve with this care, or to keep from getting worse. The information we have does not show your condition is likely to further improve with this care or get worse without it. For this reason, the request is denied as not medically necessary. There may be other treatment options to help you, such as outpatient services. You may want to discuss these with your doctor. It may help your doctor to know we reviewed the request using the MCG guideline Residential Behavioral Health Level of Care, Child or Adolescent (ORG: B-902-RES).

DGA_FG 000016; ANTHEM_FREDG000821.

Plaintiff submitted a level one appeal to Anthem along with supporting documentation including: an appeal letter, 384 pages of medical records from Outback, 21 pages of medical records from Catalyst, Dr. Jenkins' psychological assessment report, and letters of medical necessity. DGA_FG 000023–25. The Plan forwarded the appeal and supporting documentation to Anthem on February 2 through 4, 2021, *id.* at 000837–40, and Kayla Fisher, M.D. ("Dr. Fisher") conducted the

1    review, ANTHEM_FREDG000814–16.

2    Anthem upheld the denial decision in a letter, dated March 11, 2021, which

3    stated in relevant part:

> We reviewed all the information that was given to us before with the
> first request for coverage.  We also reviewed all that was given to us
> for the appeal.  Your doctor wanted you to stay longer in residential
> treatment center care.  You were getting this because you had been at
> risk for serious harm without 24 hour care.  We understand that you
> would like us to change our first decision.  Now we have new
> information from the medical record plus letters.  We still do not think
> this is medically necessary for you.  We believe our first decision is
> correct for the following reason: after the treatment you had, you were
> no longer at risk for serious harm that needed 24 hour care.  You
> could have been treated with outpatient services.  We based this
> decision on the MCG guideline Residential Behavioral Health Level
> of Care, Child or Adolescent (ORG: B-902-RES).

13   DGA_FG 000847–48.

14   On April 20, 2021, the Plan requested MRI review the level one appeal and all

15   clinical documentation received to date, and answer whether the services were

16   medically necessary as defined by the Plan. *Id.* at 000854–55.  James Kimball, M.D.

17   ("Dr. Kimball") conducted the review using the following medical guidelines in his

18   rationale: (1) the American Academy of Child and Adolescent Psychiatry, American

19   Association of Community Psychiatrists, Child and Adolescent Level of Care

20   Utilization System, Child and Adolescent Version 20, July 2019 ("CALOCUS"); and

21   (2) the Child and Adolescent Service Intensity Instrument, American Academy of

22   Child and Adolescent Psychiatry, September 2018 ("CASII"). *Id.* at 000860–61.

23   In a report, dated April 26, 2021, Dr. Kimball opined:

> The psychiatric residential treatment from 06/02/20 to discharge is not
> considered medically necessary in accordance with the Plan definition
> of medical necessity.
>
> The notes indicate that the patient has a complicated psychiatric
> history.  He has a long history of aggression and anger towards family
> members.  He had been acting out at home and using substances.  He

9

has a history of significant outpatient treatment with minimal results.
He was in a wilderness camp from February 2020 through May 2020,
which appears to have helped the patient. He was admitted to a
residential treatment facility on 05/11/20.

Unfortunately, it appears that very few clinical notes from the
residential facility have been provided for review. There are brief
notes from 10/16/20, 09/29/20 which seemed to indicate the patient's
participation in an activity. There are therapy notes from 05/15/20,
05/18/20, 05/21/20 and 05/25/20. Nursing notes were provided from
05/15/20. There was also a medication evaluation from 05/15/20. No
other notes were provided from the residential treatment facility,
including an initial history and physical.

The notes indicate that the patient is at some risk of harm, moderate
functional impairment, significant comorbidity, moderately stressful
environment, limited support in the environment, moderate response
to treatment, and incompletely engaged. As such, per the Child and
Adolescent Level of Care Utilization System for Psychiatric and
Addiction Services, coverage of continued residential level of care has
not been met. It is not clear why the patient cannot be managed at a
lower level of care.

Given that residential level of care was not the most cost efficient
treatment, service or supply than can be safely provided at the most
cost efficient and medically appropriate site and level of service, the
plan language of medically necessary has not been met.

*Id.* at 000861. The Plan notified Plaintiff by letter, dated May 11, 2021, that the

appeal was denied and that he could submit a further appeal. *Id.* at 000865–67.

On September 3, 2021, Plaintiff submitted a level two appeal along with

supporting documentation including: an appeal letter, a copy of Plaintiff's prior

appeal, and 246 pages of additional records from Catalyst for the period between June

2, 2020 through June 4, 2021. *Id.* at 000885–1200. On September 28, 2021, the Plan

sent the second-level appeal and all submitted medical records to MRI for medical

necessity review, which was again conducted by Dr. Kimball. *Id.* at 001209–15. In a

report, dated October 4, 2021, Dr. Kimball opined again that continued residential

treatment was not medically necessary in accordance with the Plan's definition of the

term. *Id.* at 001213.

10

1    Dr. Kimball's report for the level two appeal reproduced many of the sentences

2    and paragraphs from his first report verbatim, and again cited CALOCUS and CASII

3    as the medical guidelines used in the review.  *Compare id.* at 000865–67 *with*

4    001211–15.  Both reports included a "Conflict of Interest Statement," in which he

5    certified that he: "To the best of his[] knowledge, ha[d] not had any prior involvement

6    in the denial/appeal process for the case, regardless of whether the involvement was

7    on behalf of MRI[] or any other peer review vendor[.]"  *Id.* at 001214.

8    By letter, dated October 7, 2021, the Plan informed Plaintiff that his appeal

9    would be presented to the Benefits Committee of the Board at its next meeting, and

10    that "[t]he Trustees will consider all of the evidence and testimony submitted in

11    support of [Plaintiff's] appeal, but [Plaintiff would] not be entitled to make an in-

12    person appearance at the meeting."  *Id.* at 001224.

13    On March 1, 2022, the Benefits Committee denied Plaintiff's appeal "pursuant

14    to Health Plan rules and determinations by Anthem and MRI confirming that the

15    residential treatment [was] not medically necessary as defined by the Health Plan."

16    *Id.* at 001235–36.  In its supplemental response to Plaintiff's Interrogatory No. 7,

17    Defendant admitted that, "for mental health claims, [the Plan's chief medical advisor,

18    Dr. Steven M. Simons,] and the Benefits Committee rely upon the medical specialties

19    of Anthem and MRI's reviewing physicians to support the claim reasoning[.]"  Dkt.

20    68-2 at 13.

21                              **CONCLUSIONS OF LAW**

22    **I.    Standard of Review for Denial of Benefits**

23    As a threshold matter, the parties debate the standard of review applicable to

24    this matter.  "A denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed

25    under a *de novo* standard unless the benefit plan gives the administrator or fiduciary

26    discretionary authority to determine eligibility for benefits or to construe the terms of

27    the plan."  *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  "[F]or

28    a plan to alter the standard of review from the default of de novo to the more lenient

11

1  abuse of discretion, the plan must unambiguously provide discretion to the

2  administrator." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir.

3  2006) (*en banc*) (*citing Kearney*, 175 F.3d at 1090).  "ERISA plans are insufficient to

4  confer discretionary authority on the administrator when they do not grant any power

5  to construe the terms of the plan." *Id.* at 964.

6        Since Anthem has been dismissed from the action already, the court focuses

7  solely on whether the Benefits Committee possessed the requisite discretionary

8  authority to warrant an abuse of discretion standard of review.  *See* Dkt. 86 at 13 n. 4;

9  Dkt. 87 at 13.  The Trust Agreement expressly gives the Board of Trustees the

10  authority to determine eligibility for benefits and to construe and/or interpret the terms

11  of the Plan.  DGA_FG 001261–62.  Although the Trust Agreement allows the Board

12  of Trustees to allocate and delegate responsibilities to committees and subcommittees

13  of the Board, including the authority to take final action in specified areas, any such

14  allocation or delegation must be in writing and "by resolution duly adopted." *Id.* at

15  001263, 001265.

16        Defendant does not identify any separate resolution, writing, or evidence that

17  clearly establishes the Board vested the Benefits Committee with the requisite

18  discretionary authority, and admitted at trial that there is no evidence of such a

19  resolution in the record.  Accordingly, the court finds the Board of Trustees did not

20  delegate its discretionary authority to the Board's Benefits Committee

21  unambiguously, and that the denial of benefits is subject to *de novo* review.[8]  *See Dan*

22  *C. v. Anthem Blue Cross Life and Health Ins. Co.*, No. 24-3203, 2025 WL 1554927, at

23  *1 (9th Cir. June 2, 2025) (affirming trial court's ruling that the Plan's denial of

24  

25  _____

26  [8] Although the court finds *de novo* review applies here, the court's ultimate determinations remain the same under discretionary review, as the court finds below

27  that Defendant deprived Plaintiff of the opportunities to engage in "meaningful dialogue" on the issue of medical necessity and receive a "full and fair" review of the

28  denial of his claim.

continued residential treatment is subject to *de novo* review, in a parallel action involving the same claims and similar facts).[9]

## II.    Denial of Benefits

### A.    Medical Necessity

Plaintiff has met his burden to prove the residential treatment at issue was medically necessary with credible, persuasive evidence.  Anthem determined J.G.'s admission to residential psychiatric care was medically necessary when it approved his initial request for such care.  DGA_FG 000009 ("This approval means that, based on the information given to us, the service is considered medically necessary under your benefit plan").  The medical necessity of J.G.'s admission is also established by evidence in the record, including independent assessments by Dr. Jenkins (*id.* at 000786–804), NP Kunz (*id.* at 000820–23), and Dr. Naimark (ANTHEM_FREDG000816), as well as Plaintiff's letters of medical necessity (DGA_FG 000828–35).[10]  Accordingly, the court must determine whether (a) J.G.'s

---

[9] The Ninth Circuit additionally recognized that "[t]hough the Plan delegates the task of 'determining claims appeals' to the Committee and provides that the Committee 'will have discretion to deny or grant the appeal in whole or part,' this language falls short of the unambiguous delegation contemplated by [Ninth Circuit] precedent." *Dan C.*, 2025 WL 1554927, at *1 (citing *Ingram v. Martin Marietta Long Term Disability Income Plan*, 244 F.3d 1109, 1112–13 (9th Cir. 2001)).

[10] *E.g.*, DGA_FG at 000802 (Dr. Jenkins' assessment report, dated March 11, 2020: "It is strongly recommended that following his stay at Outback, [J.G.] go on to a longer-term residential therapeutic program, such as a therapeutic boarding school or boarding school with collaborative supports, that can continue addressing each of [the diagnosed] issues in depth."); *id.* at 820 (NP Kunz's psychiatric medication evaluation, dated May 14, 2020: "I highly recommend [Catalyst's] program for the individual, family, group, and recreational therapy.  … Catalyst will also allow him to work on his emotional regulation, coping skills, cognitive and behavioral issues, and solution focused motives as well as other treatment approaches."); *id.* at 000829 (letter by Heather Lin, M.D., dated July 20, 2020: "Given the lack of sustainable improvement with outpatient treatment modalities and deterioration in [J.G.'s] behavior, a higher level of care was recommended for [J.G.] and referral to

continued residential treatment was medically necessary, or (b) J.G. satisfied the requirements for discharge from residential care.

Once a patient has been admitted to residential care under the MCG Guidelines, continued residential care is "generally needed" until one of the following two situation applies:

- o Residential care is no longer necessary due to adequate patient stabilization or improvement as indicated by **ALL** of the following:
  - ▪ Risk status acceptable as indicated by **ALL** of the following:
    - Danger to self or others manageable….
    - Patient and supports understand follow-up treatment and crisis plan.
    - Provider and supports are sufficiently available at lower level of care.
    - Patient, as appropriate, can participate as needed in monitoring at available lower level of care.
  - ▪ Functional status acceptable as indicated by **1 or more** of the following:
    - No essential function is significantly impaired.
    - An essential function is impaired, but impairment is manageable at available lower level of care.
  - ▪ Medical needs absent or manageable at available lower level of care as indicated by **ALL** of the following:
    - Adverse medication effects absent or manageable
    - Medical comorbidity absent or manageable …
    - Medical complications absent or manageable
  - ▪ Treatment goals for level of care met.

/ / /

_____

educational consultant/ placement specialist Randi Klein was provided to the family to help guide them towards the appropriate residential treatment facilities"); *id.* at 000831 (letter by Randi Klein, MS, LMFT, LPCC, dated July 7, 2020: "I recommended that J.G. attend Outback Therapeutic Expeditions. After this program, the treatment team, including myself, recommended that [J.G.] attend[] a residential treatment facility … called Catalyst Residential Treatment Center in Utah.").

○ Residential care is no longer necessary due to **1 or more** of the following:
- Higher level of care is indicated (eg, patient condition has deteriorated or more intensive supervision is necessary to address clinical needs).
- Lack of improvement indicates need for long-term custodial facility.
- Patient or guardian refuses treatment.

DGA_FG 000072–73 (emphasis in original, footnotes and references omitted).

Anthem's denial letter, dated June 4, 2020, and Dr. Naimark's notes offered the following rationale in support of the denial decision:

> The plan clinical criteria considers ongoing residential treatment medically necessary for those who are a danger to themselves or others…. This service can also be medically necessary for those who have a mental health condition that is causing serious problems with functioning. … In addition, the person must be willing to stay and participate, and is expected to either improve with this care, or to keep from getting worse. The information we have does not show your condition is likely to further improve with this care or get worse without it. For this reason, the request is denied as not medically necessary.

DGA_FG 000016; ANTHEM_FREDG000821.

Dr. Naimark did not state continued residential care was no longer necessary due to adequate patient stabilization or improvement, or discuss how J.G. met the factors for discharge on this basis.[11]   *See* ANTHEM_FREDG 000817–22.  To the

---

[11] Defendant contends "the Plan's decision, based on informed medical reviews, was correct because J.G. posed no harm to himself or others justifying 24/7 residential treatment care." Dkt. 86 at 1. That, however, is not the standard for discharge from residential treatment under the MCG Guidelines. DGA_FG 000072–73. Although Defendant's stated justification could potentially support denial of care under the Admission Guidelines of the MCG Guidelines, *see id.* at 000072, Defendant provides no evidence or legal authority to establish that residential treatment is no longer medically necessary under the MCG Guidelines and an admitted patient should be discharged once the patient's clinical status has improved to the point that the patient

1   contrary, Dr. Naimark noted J.G.'s chart indicated he had a very chronic diagnosis of

2   oppositional defiant disorder and would not be expected to improve with a short-term

3   intervention, and that the treatment "[was] expected to be a long term placement of

4   180 days." *Id.* at 000822.  This should have resulted in a determination that discharge

5   based on adequate patient stabilization or improvement was not warranted, and

6   continued residential treatment was medically necessary, because J.G.'s medical needs

7   were not manageable at an available lower level of care.[12]  *See* DGA_FG 000073.[13]

8       Dr. Fisher's assessment on the level one appeal, ANTHEM_FREDG000815–

9   16, likewise, does not support discharge under the MCG Guidelines, as Dr. Fisher

10  agreed with and relied on Dr. Naimark's analysis without discussing how this analysis

11  was consistent with the MCG Guidelines for discharging a patient due to adequate

12  patient stabilization or improvement.  Accordingly, the court finds neither Dr.

---

would no longer qualify for admission.  Defendant, thus, fails to establish J.G.'s continued residential care was no longer medically necessary on this basis.

[12] In particular, neither Dr. Naimark nor Dr. Fisher found, or identified any evidence to support a finding, that J.G.'s medical comorbidity and substance-related disorder became absent or manageable as of June 2, 2020, as would be required to justify discharge under the MCG Guidelines.  *See* DGA_FG 000073.  While Defendant notes Dr. Fisher stated in her report that J.G. "was not using substances while in the program," Dkt. 92 at 7 (citing ANTHEM_FREDG000815), the fact that J.G. did not use illegal narcotics and other substances while in residential treatment is insufficient to establish that his "[s]ubstance-related disorder [was] absent or manageable," when coverage for continued residential treatment was denied.

[13] Although Dr. Naimark's analysis could potentially have supported discharge on the grounds that a "[h]igher level of care [was] indicated" or "[l]ack of improvement indicate[d] need for long-term custodial facility," *see* DGA_FG 000073, neither Anthem nor DGA offered this as a basis for the denial of coverage.  To the extent Defendant may argue continued residential treatment was denied on this basis, such denial would constitute a violation of the Plan's obligations to: "(1) provide adequate notice in writing to [Plaintiff], setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and (2) afford a reasonable opportunity to [Plaintiff] for a full and fair review … of the decision denying the claim."  29 U.S.C. § 1133; *Dan C.*, 2025 WL 1554927, at *2.

1    Naimark nor Dr. Fisher's reports are sufficient to establish lack of medical necessity

2    or justify Anthem and the Plan's denial of coverage for continued residential care.

3        Defendant additionally argues its denial decision was appropriate because Dr.

4    Kimball determined independently that "the Plan's medical necessity standard for

5    continued residential care coverage had not been met and that J.G.'s treatment could

6    have been managed at a lower level of care." Dkt. 86 at 14.  Dr. Kimball, however,

7    did not evaluate J.G.'s continued treatment under the MCG Guidelines and relied

8    instead on CALOCUS and CASII—neither of which were included in the

9    administrative record.  While the parties have submitted a copy of the CALOCUS

10   manual for the court's review, Dkt. 69-2, they have not provided the court with the

11   CASII guidelines.  Dr. Kimball's expert opinions, thus, lack adequate foundation and

12   are inadmissible.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592

13   (1993).

14       Even if the court were to consider Dr. Kimball's opinion based on the

15   CALOCUS guidelines alone, Dr. Kimball's assessment would not constitute a valid

16   basis to deny continued residential treatment as of June 2, 2020, since CALOCUS

17   specifies that patient reviews should not be conducted more often than "every three

18   months for extended care services such as residential treatment facilities."  Dkt. 69-2

19   at 30.  As it is undisputed that J.G.'s admittance to residential treatment on or around

20   May 14, 2020 was medically necessary, it was improper for Dr. Kimball to apply

21   CALOCUS to determine whether continued residential care was medically necessary

22   less than three weeks later.

23       Furthermore, Dr. Kimball's reports clearly indicate his assessments were of

24   J.G.'s conditions as of the date of the reports—after J.G. had received months of

25   residential treatment.  *See* DGA_FG 000853 (discussing J.G.'s treatment notes from

26   Catalyst up to and including October 16, 2020, before concluding: "The notes indicate

27   that the patient **is** at some risk of harm, moderate functional impairment, significant

28   comorbidity, moderately stressful environment, limited support in the environment,

moderate response to treatment, and incompletely engaged") (emphasis added); *id.* at 001213 (discussing treatment notes up to and including May 25, 2021, before concluding the same).[14]   Accordingly, these assessments do not support his conclusion that continued residential treatment was not medically necessary as of June 2, 2020, when coverage for continued residential treatment was denied.  If anything, Dr. Kimball's assessments demonstrate J.G.'s residential treatment at Catalyst was successful and resulted in sufficient patient stabilization and improvement to allow him to be treated at a lower level of care by the time of his discharge.

Defendant argues Plaintiff's medical necessity letters have no probative value regarding whether the Plan's standard for medical necessity was met, because they fail

---

[14] Since CALOCUS requires an evaluator to "select the highest score or rating in which at least one of the criteria is met," Dkt. 69-2, Dr. Kimball's evaluations would only be consistent with his own discussion of J.G.'s "complicated psychiatric history" if they were of J.G.'s status at the date of the reports, rather than when coverage for continued residential treatment was denied.  For example, dimension V of CALOCUS concerns "Resiliency and Treatment History."  *Id.* at 17–18.  Dr. Kimball noted J.G. had "a history of significant outpatient treatment with minimal results," DGA_FG 000861, 001212, which is consistent with a finding of poor resiliency and/or response to treatment (rating 4, which includes: "b- Previous treatment has not achieved complete remission of symptoms or optimal control of symptoms even with intensive and/or repeated exposure to treatment" and "c- Attempts to maintain whatever gains that were attained in intensive treatment have limited success, even for limited time periods or in structured settings").  Dr. Kimball, however, found J.G. had a "moderate response to treatment" (rating 3, which includes: "b- Previous experience in treatment at low level of intensity has not been successful in relief of symptoms or optimal control of symptoms" and "c- Recovery has been maintained for moderate periods of time, but only with strong professional or peer supports or in structured settings").  DGA_FG 000861, 001212.

Evaluating J.G.'s conduct and mental health history based on his "complicated psychiatric history" alone, without considering the post-denial treatment notes from Catalyst, would result in a CALOCUS level of care recommendation of level five: medically monitored residence-based services—which is the level of care Plaintiff requested.  *See* Dkt. 69-2 at 8–38.  This assessment is also consistent with Anthem's initial determination that J.G.'s admission to residential treatment was medically necessary.

to address whether J.G.'s treatment at Catalyst was the most appropriate and cost-efficient treatment, service, or supply that could be safely provided, at the most cost-efficient and medically appropriate site and level of service. Dkt. 86 at 15–17. According to Defendant, "[a]lthough many of the clinicians asserted that J.G.'s parents had exhausted all treatment options, none of the treating clinicians considered the option of [intensive outpatient program ('IOP')] or [partial hospitalization program ('PHP')] care, even on a trial basis, prior to beginning at Outback/Catalyst, or following the initial approved stay at Catalyst." *Id.* at 16 (emphasis omitted).

Defendant does not offer any argument or explanation why Plaintiff would need to establish IOP or PHP care were not more cost-effective, given that Anthem, itself, found J.G.'s admission to residential treatment at Catalyst was medically necessary under the Plan without any discussion of IOP or PHP care. *See* DGA_FG 000009. Defendant, likewise, does not identify any medical guidelines that state that a patient that has been admitted to residential treatment should be removed from such treatment after less than three weeks of care and required to participate in IOP or PHP care to receive continued residential treatment. To the contrary, the MCG Guidelines establish that such removal is improper unless the patient satisfies the Discharge Guidelines, and CALOCUS precludes reevaluation before the patient has received three months of care. Defendant's argument, thus, fails.

Accordingly, the court concludes Defendant violated the terms of the Plan by determining J.G.'s continued residential treatment was not medically necessary and denying J.G. coverage for continued residential care. Plaintiff, thus, is entitled to benefits.

**B.    Full and Fair Opportunity for Review**

The Plan also failed to conform to the claims procedure required by statute and regulation. Under federal law, an ERISA plan must:

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to

be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.

ERISA requires "a meaningful dialogue between ERISA plan administrators and their beneficiaries." *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997) (citing 29 C.F.R. 2560.503-1(g)(1) (former subd. (f))). "If benefits are denied in whole or in part, the reason for the denial must be stated in reasonably clear language, with specific reference to the plan provisions that form the basis for the denial; if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it." *Id.*

"A plan administrator abuses its discretion if it renders a decision without any explanation, construes provisions of the plan in a way that conflicts with the plain language of the plan, or fails to develop facts necessary to its determination." *Anderson v. Suburban Teamsters of N. Ill. Pension Fund Bd. of Trs.*, 588 F.3d 641, 649 (9th Cir. 2009). "The general rule … is that a court will not allow an ERISA plan administrator to assert a reason for denial of benefits that it had not given during the administrative process." *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 719–20 (9th Cir. 2012). "The remedy for an improper denial of benefits due to a procedurally deficient review of a claim is the same as the remedy for an improper denial of benefits due to a substantively incorrect medical necessity determination." *Dan C.*, 2025 WL 1554927, at *2 n. 2 (citing *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 680–81 (9th Cir. 2011)).

In *Dan C.*, 2025 WL 1554927, at *2, the Ninth Circuit affirmed the lower court's ruling, in an unrelated action against Anthem and the Plan involving similar facts, that the Plan deprived the plaintiff of a full and fair review due to a "fundamental failure to explain to [the *Dan C.* plaintiff] that the Plan's operative definition of medical necessity required attempting lower levels of care—namely, an

20

intensive outpatient program [IOP] or partial hospitalization program [PHP]—before
residential treatment." Although "the Plan's medical reviewers noted internally that
IOP or PHP services would be more appropriate for [the minor] than residential
treatment," subsequent letters from the Plan to the *Dan C.* plaintiff indicated only that
"residential treatment was not medically necessary because [the minor] did not pose a
danger to himself or others and did not experience serious problems with daily
functioning—and therefore could be treated with 'outpatient services' instead." *Id.* at
*3. Because IOP or PHP were not mentioned to the plaintiff in writing until after the
minor's discharge from the residential treatment facility, the Ninth Circuit held
Anthem and the Plan's "inadequate notice deprived Plaintiff of the opportunity to
'answer[] in time' the Plan's questions about lower levels of care, to engage in
'meaningful dialogue' on the issue of medical necessity, and to receive a 'full and
fair' review of the denial of his claim." *Id.* (citing *Salomaa*, 642 F.3d at 679–80).

The denial letter here was nearly identical to the letter in *Dan C.*, and stated:
"There may be other treatment options to help you, such as outpatient services,"
DGA_FG 000016, without explaining: (1) why J.G.'s prior "significant" outpatient
treatments, including at Outback, were insufficient; (2) what program or types of
outpatient programs Anthem and the Plan believed J.G. should attempt prior to
continued residential treatment;[15] (3) why Anthem believed J.G. needed to interrupt
his residential treatment to attempt IOP or PHP services before he could receive
continued care; (4) why such interruption was medically necessary or appropriate
considering Anthem had approved his admission to residential treatment already; (5)
how J.G. was logistically or practically supposed to attempt IOP or PHP services to

---

[15] Here, as in *Dan C.*, 2025 WL 1554927, at *3, neither Anthem nor the Plan
mentioned IOP or PHP to Plaintiff in writing until four months after J.G. was
discharged from Catalyst on June 4, 2021. *See* DGA_FG 001217 (letter denying
Plaintiff's second-level appeal, dated October 7, 2021, stating for the first time that
"the most cost effective and efficient modality for the treatment is [PHP]."

obtain continued residential treatment, given that he was undergoing the previously approved residential treatment when continued coverage was denied; and/or (6) what evidence and analysis led Dr. Naimark and Anthem to conclude "[r]esidential care [was] no longer necessary due to adequate patient stabilization or improvement" under the MCG Guidelines, such that J.G. could be discharged to a lower level of care.

Here, as in *Dan C.*, 2025 WL 1554927, at *2, Defendant's inadequate notice deprived Plaintiff of the opportunity to "answer[] in time" the Plan's questions about lower levels of care, engage in "meaningful dialogue" on the issue of medical necessity, and receive a "full and fair" review of the denial of his claim. Defendant's subsequent letters to Plaintiff were similarly deficient and failed to provide Plaintiff a "full and fair" review. *See* DGA_FG 000847–52, 000865–72, 001216–23.[16]

The court, therefore, finds Plaintiff's benefits were improperly denied due to a procedurally deficient review of his claim and that Plaintiff is entitled to benefits on this additional basis.

**III.    Breach of Fiduciary Duty**

"ERISA also provides a claim for breach of fiduciary duty." *Castillo v. Metro. Life Ins. Co.*, 970 F.3d 1224, 1228 (9th Cir. 2020). "Just as trust law imposes duties on trustees, ERISA imposes duties on plan fiduciaries." *Id.* "A fiduciary, for instance, must 'discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... with the care, skill, prudence, and diligence ... of a prudent man." *Id.* (brackets omitted) (quoting 29 U.S.C. § 1104(a)(1)). "An individual bringing a claim under § 1132(a)(3) may seek 'appropriate equitable relief,' which refers to 'those categories of relief' that, traditionally speaking … were

---

[16] Notably, the Plan failed to offer any explanation for why MRI reviewed the appeals under CALOCUS and CASII, rather than the MCG Guidelines, *see* DGA_FG 000865–67, 001216–18, which further deprived Plaintiff of the opportunity to engage in "meaningful dialogue" on the issue of medical necessity and receive a "full and fair" review of his appeals.

1  typically available in equity." *Id.* at 1229 (cleaned up) (quoting *CIGNA Corp. v.*
2  *Amara*, 563 U.S. 421, 439 (2011)).

3      "Because § 1132(a)(3) acts as a safety net, offering appropriate equitable relief
4  for injuries caused by violations that [ERISA] § 502 does not elsewhere adequately
5  remedy, relief is not available under § 1132(a)(3) where Congress elsewhere provided
6  adequate relief for a beneficiary's injury." *Id.* (cleaned up). "Thus, a claimant may
7  not bring a claim for denial of benefits under § 1132(a)(3) when a claim under
8  § 1132(a)(1)(B) will afford adequate relief." *Id.* "Claims under § 1132(a)(1)(B) and
9  § 1132(a)(3), however, may proceed simultaneously so long as there is no double
10  recovery." *Id.* (quotation marks and citation omitted).

11      In the First Amended Complaint, Plaintiff seeks equitable relief including an
12  order "enjoining the Plan from using level of care guidelines that fall below
13  reasonable standards in the medical community, either as written or as applied, or
14  both," in addition to his request to recover the full amount of benefits that were
15  denied. Dkt. 13 ¶ 56. Plaintiff's Opening Trial Brief requests the court "fashion
16  appropriate relief so that neither Plaintiff nor other DGA plan participants are
17  subjected to such claims handling mis-administration." Dkt. 87 at 22. Defendant
18  responds that any request for relief on behalf of a non-party is improper because
19  Plaintiff did not bring a class action and has not alleged any basis for third-party
20  standing. Dkt. 92 at 15.

21      Plaintiff did not demonstrate at trial that either he or J.G. are likely to have
22  future claims denied based on the level of care guidelines applied here, or that any
23  form of equitable relief is warranted for non-party Plan participants or beneficiaries.
24  The court, therefore, holds Plaintiff is not entitled to any relief beyond recovery of the
25  benefits due, prejudgment interest, and reasonable attorney's fees and costs, and that
26  "[equitable] relief is not available [to Plaintiff] under § 1132(a)(3)." *See Castillo*, 970
27  F.3d at 1229; *see also Dan C.*, 2025 WL 1554927, at *3.

28  / / /

## CONCLUSION

Plaintiff's request to overturn Defendant's denial of benefits is GRANTED, and judgment is entered in Plaintiff's favor on his § 1132(a)(1)(B) claim.  Plaintiff's request for additional equitable relief under § 1132(a)(3) is DENIED.  Plaintiff may bring a motion for attorney's fees and costs as permitted under ERISA, 29 U.S.C. § 1132(a)(1)(B), (g)(1).  Plaintiff shall file a proposed judgment and e-mail a Word format version directly to the court's chambers email address within five (5) business days of the filing of this Order.


IT IS SO ORDERED.


Dated: July 7, 2025

_____
FERNANDO L. AENLLE-ROCHA
United States District Judge